Judge GIERKE
delivered the opinion of the Court.
A general court-martial convicted appellant, contrary to his pleas, of housebreaking and conduct unbecoming an officer, in violation of Articles 130 and 133, Uniform Code of Military Justice, 10 USC §§ 930 and 933, respectively. The adjudged and approved sentence provides for a dismissal, confinement for 5 years, and total forfeitures. Pursuant to Article 58b(b), UCMJ, 10 USC § 858b(b), the convening authority waived the total forfeitures for 6 months. The Court of Criminal Appeals affirmed the findings and sentence without opinion.
This Court granted review of the following issue:
WHETHER THE MILITARY JUDGE ERRED AS A MATTER OF LAW WHEN HE DENIED THE DEFENSE MOTION TO SUPPRESS BLOOD SEIZED FROM APPELLANT, AND THE DERIVATIVE EVIDENCE FROM APPELLANT’S BLOOD, WHERE THERE WAS INSUFFICIENT EVIDENCE PRESENTED TO THE MILITARY MAGISTRATE TO ESTABLISH PROBABLE CAUSE TO SEIZE APPELLANT’S BLOOD.
For the reasons set out below, we affirm the decision of the Court of Criminal Appeals.

I. Factual Background

Appellant was convicted of housebreaking by unlawfully entering the tent of a sleeping female officer, with intent to indecently assault her, and conduct unbecoming an officer by exposing his penis, masturbating, and ejaculating onto the sleeping female officer. Appellant was identified as the perpetrator of the offenses by comparing the deoxyribonucleic acid (DNA) from the semen on the female officer’s shirt to appellant’s DNA, which was obtained by taking a sample of his blood. The seizure of appellant’s blood was pursuant to a search authorization issued by Lieutenant Colonel (LTC) Willis Hunter, a Judge Advocate General’s Corps officer assigned as a military magistrate. The granted issue challenges LTC Hunter’s determination that there was probable cause to issue the search authorization.
At trial, the issue was timely raised by a motion to suppress the evidence obtained from appellant’s blood sample. During the hearing on the motion, LTC Hunter testified that the request for a search authorization was supported by an affidavit from U.S. Army Criminal Investigation Command (CID) Special Agent (SA) Voos that outlined the results of an investigation by SA Hazell. SA Voos was stationed at Fort Hood, Texas. He did not personally conduct the investigation, but instead was relaying the results of SA Hazell’s investigation, which was conducted in Kuwait where the offenses occurred. Appellant’s parent unit was at Fort Hood, and this case was tried at Fort Hood.
The affidavit related that at about 7:56 a.m. on September 25,1996, First Lieutenant (1LT) CV notified Military Police Sergeant (SGT) Stone that at about 4:25 a.m. on that morning, she was awakened and felt what appeared to be water dripping on her face. She realized that an unidentified man was above her, with his knees against her upper torso and his crotch toward her face. She got up from her cot and chased the unidentified male, shouting at him to stop. Two unit guards, Private First Class (PFC) Vanhoozer and PFC Haywood, chased the unidentified male but could not catch him.
Both PFC Vanhoozer and PFC Haywood told SA Hazell that they were on guard duty between 3:00 a.m. and 5:00 a.m. and that they heard a female voice shouting, “Stop, come back here!” or “Stop and come here!” They immediately began chasing a tall black male, who was wearing a battle dress uniform (BDU) but no load-bearing equipment (LBE) or headgear. Both guards described the unidentified male as a fast runner, and they were unable to catch him.
1LT CV stopped running and wiped from her face a fluid substance that she believed to be semen. She wiped one of her hands on *416 her shirt and the other on the ground. 1LT CV was unable to provide any identifying information about the individual other than describing him as a male of medium height.
Sergeant First Class (SFC) Gaskins, a female noncommissioned officer (NCO) who shared the tent with 1LT CV, told SA Hazell that appellant came to the tent about 10:00 p.m. on September 24, 1996, looking for 1LT CV. Appellant told SFC Gaskins that he had a request for a linguist support mission for September 25. 1LT CV was asleep, and SFC Gaskins told appellant that she would give her the message.
Captain (CPT) Harris told SA Hazell that he was outside his tent at about 4:00 a.m. on September 25 and observed a tall, slender, black male, dressed in BDUs, with no LBE or protective mask, run past him with two unit guards in pursuit. CPT Harris stopped the two guards, and they informed him that 1LT CV had been assaulted and that they were pursuing the individual who ran away from her tent.
CPT Creech told SA Hazell that at around 4:45 a.m. on September 25, he heard a female voice screaming, “Come back here!” and he heard people running. He observed 1LT CV in a physical training shirt and shorts, without shoes or socks, and she told him what had happened in her tent. CPT Creech went to the tactical operations center (TOC) and asked for appellant, who was on duty as the Battle Captain. No one in the TOC knew where appellant was. CPT Creech stated that “some time later,” appellant entered the TOC, dressed in BDUs with no protective mask, LBE, or headgear. Appellant appeared to be perspiring and appeared nervous or “fidgety.” When SA Hazell reinterviewed CPT Creech, he said that when appellant returned to the TOC, he was wearing BDUs and black boots and that he had his protective mask.
Staff Sergeant (SSG) Clark told SA Hazell that he was on duty as the Battle NCO between 3:00 a.m. and 5:00 a.m. on September 25. SSG Clark said that when CPT Creech reported the incident involving 1LT CV, he did not know where appellant was. SSG Clark said that when appellant returned to the tent, he assisted the unit guards in making their statements.
1LT Schultze told SA Hazell that he heard something moving outside his tent at about 4:40 a.m. on September 25. It sounded like someone had tripped over a tent rope or pole. He looked outside and saw a “dark skinned soldier,” dressed in BDUs, scrambling to get up. He did not see the soldier’s face.
SFC Holden told SA Hazell that he was the NCO in charge of the TOC during duty hours and worked closely with appellant. He said that since the incident involving 1LT CV, appellant’s demeanor changed and he was “extremely nervous, acting at times as if he were in a daze.” SFC Holden observed appellant’s hands after the incident and noticed that his palms appeared to be red. When he was reinterviewed, SFC Holden said that appellant showed him both of his hands a few days after the incident and that the insides of his hands were red.
Major (MAJ) Cloy told SA Hazell that he asked appellant to show him his hands. MAJ Cloy noticed that appellant appeared nervous and that his right hand appeared red and dry.
SGT Sims told SA Hazell that appellant returned to the TOC about 20 minutes after CPT Creech came looking for him. He said that appellant appeared tired and nervous, and that his demeanor had changed since the incident. When SA Hazell reinterviewed SGT Sims, SGT Sims said that appellant returned to the TOC wearing BDUs, with no LBE or weapon.
The affidavit recites that appellant was advised of his rights and interviewed by SA Hazell. Appellant denied committing the offense. He declined to provide samples of his blood, saliva, or hair, and he stated that he wanted to consult with his civilian attorney in Texas.
SA Voos stated in the affidavit that appellant is a black male, 68 inches tall, with black hair, brown eyes, and a slim build. He stated that the field site where the incident occurred was a controlled area patrolled by *417 unit guards. Finally, he stated that semen stains were found on 1LT CV’s shirt.
LTC Hunter testified that the affidavit did not have as much detail as he would normally expect a criminal investigator to have, so he asked additional questions. He tried to pin down whether the perpetrator could have come from outside the unit area. He determined after discussion with SA Voos that the unit was a military intelligence unit, and that the area was a secure area protected by perimeter guards. He concluded that it was highly unlikely the perpetrator was someone outside the unit.
On cross-examination, LTC Hunter testified that some of his questions arose because the affidavit was not “well laid out.” On examination by the military judge, LTC Hunter testified that he asked SA Voos how many soldiers were in the unit and how many were black males. SA Voos was unable to provide the information. LTC Hunter testified that he knew from his military experience that the unit was “a company size unit,” and he concluded that there were “approximately 100-150 people” in the unit. He testified that he also knew from his experience that a soldier would not be deployed to a field location in Kuwait without LBE, kevlar helmet, and protective mask. Finally, he knew that, as Battle Captain, appellant would have been “the official who was running the Tactical Operation Center at that time period.”
SA Voos requested authorization to obtain blood samples, pubic hairs, and head hairs. Based on the affidavit and his conversation with the CID agents, LTC Hunter issued the search authorization, but he modified it to authorize seizure only of a blood sample, not head and pubic hair. SA Meyer, a member of the Fort Hood CID office, took the search authorization to Darnall Army Community Hospital at Fort Hood, where he asked a medical technician to take a blood sample from appellant. SA Meyer observed the blood being drawn from appellant, took custody of the vials of blood, and secured them as evidence.
None of the facts asserted in the affidavit were disputed at trial. The dispute was whether the facts presented to LTC Hunter constituted probable cause to take a blood sample from appellant.
The military judge denied the motion to suppress. He stated on the record that he thought the probable cause issue was a close call. He also found that the search authorization was executed in good faith. He concluded that, even if the magistrate did not have probable cause, he “certainly had a substantial basis to believe [there] was probable cause.” The military judge specifically noted that SA Voos did not withhold any information. He presented inculpatory as well as exculpatory information. He did not attempt to resolve conflicts in the evidence. Instead, he simply presented the conflicting evidence.
Before this Court, appellant asserts that the evidence was insufficient to establish probable cause. He asserts that the magistrate failed to narrow the pool of possible suspects. He points out that the magistrate concluded the incident occurred at a field site of a military intelligence unit, when in fact appellant and most of the witnesses were assigned to Headquarters and Headquarters Company, 3d Brigade, 1st Cavalry Division. Two witnesses were assigned to the 8th Engineer Battalion, and one to the 545th Military Police Company. The witnesses’ units all were reflected in SA Voos’s affidavit. He argues that the magistrate erred by making his own conclusions that the unit at the field site was a military intelligence unit of approximately 100-150 soldiers, instead of requiring CID to find out how many black males were in the unit at the field site at the time in question.
Appellant also asserts that the warrant was defective because significant questions regarding the chain of custody and true owner of the semen-stained shirt were not brought to the magistrate’s attention. Appellant concedes that SA Voos may not have known about the chain of custody problems when he submitted the affidavit to LTC Hunter.
Finally, appellant asserts that the CID agents did not act in good faith in executing the warrant because the “bare bones” affida *418 vit provided by SA Voos did not provide a substantial basis to determine that probable cause existed. Appellant concedes that the first prong of Mil.R.Evid. 311(b)(3), Manual for Courts-Martial, United States (1995 ed.),[1] is met, but asserts that the second and third prongs are not met. Id.
The Government argues that the affidavit supplied more than enough information to provide a substantial basis for a probable cause determination. The Government further argues that, even if the search authorization was defective, the good-faith exception applies to this case.

II. Discussion

A. Probable Cause

Nonconsensual extraction of blood from an individual may be made pursuant to a valid search authorization, supported by probable cause. Mil.R.Evid. 312(d); see generally Schmerber v. California, 384 U.S. 757, 769-70, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); United States v. Bush, 47 MJ 305 (1997); United States v. Fitten, 42 MJ 179 (1995); United States v. Bullock, 71 F.3d 171 (5th Cir.1995).
Mil.R.Evid. 315(f)(2) provides:
Probable cause to search exists when there is a reasonable belief that the person, property, or evidence sought is located in the place or on the person to be search [sic].
This rule has no counterpart in the Federal Rules of Evidence.
In Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court abandoned the two-pronged test established by Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), for determining whether probable cause exists. In its place, Gates promulgated a less rigid rule:
[W]e conclude that it is wiser to abandon the “two-pronged test” established by our decisions in Aguilar and Spinelli. In its place we reaffirm the totality-of-the-circumstances analysis that traditionally has informed probable-cause determinations---- The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the “veracity” and “basis of knowledge” of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.
462 U.S. at 238, 103 S.Ct. 2317 (footnote and citations omitted).
“[P]robable cause deals ‘with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act[.]’ ” Id. at 241, 103 S.Ct. 2317 (quoting Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). “[0]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.” Id. at 235, 103 S.Ct. 2317 (quoting Spinelli, 393 U.S. at 419, 89 S.Ct. 584).
A military judge’s decision to admit or exclude evidence is reviewed for abuse of discretion. United States v. Owens, 51 MJ 204, 209 (1999). In reviewing probable cause determinations, courts must look at the information made known to the authorizing official at the time of his decision. United States v. Cunningham, 11 MJ 242, 243 (CMA 1981). The evidence must be considered in the light most favorable to the prevailing party. United States v. Reister, 44 MJ 409, 413 (1996).
Gates set out a specific standard of review for probable cause determinations: “[T]he duty of a reviewing court is simply to ensure that the magistrate had a ‘substantial basis for ... concluding]’ that probable cause existed.” 462 U.S. at 238-39,103 S.Ct. 2317 (quoting Jones v. United States, 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)); see also United States v. Monroe, 52 *419 MJ 326, 331 (2000). “In reviewing a decision that there was probable cause for a search, we must keep in mind that ‘a determination of probable cause by a neutral and detached magistrate is entitled to substantial deference.’” United States v. Maxwell, 45 MJ 406, 423 (1996)(quoting United States v. Oloyede, 982 F.2d 133, 138 (4th Cir.1993)) (citing United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)).
“[Resolution of doubtful or marginal cases ... should be largely determined by the preference ... [for] warrants____ [C]lose calls will be resolved in favor of sustaining the magistrate’s decision.” Monroe, supra (quoting Maxwell, supra). “ ‘A grudging or negative attitude by reviewing courts towards warrants,’ ... is inconsistent with the Fourth Amendment’s strong preference for searches conducted pursuant to a warrant; ‘courts should not invalidate warrantfs] by interpreting affidavits] in a hypertechnical, rather than a commonsense, manner.’ ” Gates, 462 U.S. at 236, 103 S.Ct. 2317 (quoting Ventresca, supra at 108-09, 85 S.Ct. 741).
In United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court reviewed the principles underlying appellate deference to a magistrate’s determination of probable cause. The Court reiterated its “strong preference for warrants” and declared that “in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall.” Id. at 914, 104 S.Ct. 3405 (quoting Ventresca, supra at 106, 85 S.Ct. 741). The Court recognized that “Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according ‘great deference’ to a magistrate’s determination.” Id. (citing Spinelly supra at 419, 89 S.Ct. 584). The Court set out three exceptions, however, to this “great deference”:
First, “the deference accorded to a magistrate’s finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based. Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).”
Second, the magistrate must “perform his ‘neutral and detached’ function and not serve merely as a rubber stamp for the police. Aguilar v. Texas, supra, at 111, 84 S.Ct. 1509.”
“Third, reviewing courts will not defer to a warrant based on an affidavit that does not ‘provide the magistrate with a substantial basis for determining the existence of probable cause.’ Illinois v. Gates, 462 U.S., at 239, 103 S.Ct. 2317.” The magistrate’s determination “cannot be a mere ratification of the bare conclusions of others.” Id. at 914-15, 104 S.Ct. 3405.
Applying the foregoing principles, we are reluctant to overturn the ruling of the military judge and the decision of the court below. However, we need not and do not decide if the military judge abused his discretion by concluding that LTC Hunter had a substantial basis for finding probable cause, because we are satisfied that the search authorization was executed in good faith.

B. Good Faith

In Leon, the Supreme Court recognized, for the first time, the “good faith” exception to the exclusionary rule in cases where the official executing the warrant relied on the magistrate’s probable cause determination and the technical sufficiency of the warrant, and that reliance was “objectively reasonable.” 468 U.S. at 922, 104 S.Ct. 3405. The Court also listed four circumstances where the “good faith” exception would not apply:
(1) False or reckless affidavit — Where the magistrate “was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth”;
(2) Lack of judicial review — Where the magistrate “wholly abandoned his judicial role” or was a mere rubber stamp for the police;
(3) Facially deficient affidavit — Where the warrant was based on an affidavit “so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable”; and
*420 (4) Facially deficient warrant — Where the warrant is “so facially deficient — ie., in failing to particularize the place to be searched or the things to be seized — that the executing officers cannot reasonably presume it to be valid. Cf. Massachusetts v. Sheppard [468 U.S. 981] at 988-991 [104 S.Ct. 3424, 82 L.Ed.2d 737 (1984)].” 468 U.S. at 923, 104 S.Ct. 3430.
In Sheppard, decided on the same day as Leon, the Supreme Court applied the good faith exception to a situation where a warrant authorized a search for controlled substances, but the supporting affidavit requested authority to search for evidence of a homicide: a bottle of liquor, two bags of marijuana, clothing, wire, rope, a blunt instrument, and any items containing the victim’s fingerprints. The error occurred when the police attempted to modify a pre-printed warrant form designed for drug cases. The warrant was requested on a Sunday, when the local courthouse was closed. The police officer made a number of modifications to the form, but he neglected to delete the reference to “controlled substance” on the warrant form itself. The judge reviewed the officer’s affidavit and said he would authorize the search. The judge unsuccessfully attempted to obtain a more suitable form for the warrant, and then made further modifications on the warrant form prepared by the police officer. The judge gave the police officer the modified warrant form and told him it was sufficient authority in form and content to carry out the search that he had requested.
Even though the warrant on its face still authorized a search for controlled substances instead of the items listed in the supporting affidavit, the Supreme Court applied the good faith exception to uphold the search, concluding that “a reasonable police officer would have concluded ... that the warrant authorized a search for the materials outlined in the affidavit.” 468 U.S. at 989, 104 S.Ct. 3424. The Court reasoned that “[s]uppressing evidence because the judge failed to make all the necessary clerical corrections despite his assurances that such changes would be made will not serve the deterrent function that the exclusionary rule was designed to achieve.” Id. at 990-91, 104 S.Ct. 3424.
The good faith exception is contained in Mil.R.Evid. 311(b)(3), which provides as follows:
Evidence that was obtained as a result of an unlawful search or seizure may be used if:
(A) The search or seizure resulted from an authorization to search, seize or apprehend issued by an individual competent to issue the authorization under Mil.R.Evid. 315(d) or from a search warrant or arrest warrant issued by competent civilian authority;
(B) The individual issuing the authorization or warrant had a substantial basis for determining the existence of probable cause; and
(C) The officials seeking and executing the authorization or warrant reasonably and with good faith relied on the issuance of the authorization or warrant. Good faith shall be determined on an objective standard.
The drafters of Mil.R.Evid. 311(b)(3) intended “to incorporate the ‘good faith’ exception to the exclusionary rule based on United States v. Leon ... and Massachusetts v. Sheppard ....” Drafters’ Analysis of Mil. R.Evid. 311(b)(3), Manual, supra at A22-18. Of course, the intent of the drafters is not necessarily the intent of the President. However, the parties do not assert that the President had a contrary intent with respect to this rule, and we have discovered nothing suggesting that the President’s intent in promulgating Mil.R.Evid. 311(b)(3) was different from the drafters’ intent.
The phrase “substantial basis for determining the existence of probable cause,” which is listed as the second prong of the good faith exception in Mil.R.Evid. 311(b)(3)(B), does not appear in Sheppard. It appears in Leon, but only in the discussion of the Gates test regarding a trial court’s deference to the magistrate’s determination of probable cause; it does not appear in the discussion of the good faith exception.
*421 In Monroe, this Court upheld a magistrate’s determination of probable cause to search. As an alternate holding, we held that the evidence that was seized would be admissible under the good faith exception, even if the magistrate’s “probable cause determination had lacked a substantial basis[.]” 52 MJ at 332. We specifically cited Leon in support of this holding, but we also referred to Mil.R.Evid. 311(b)(3) in a footnote. Because Mil.R.Evid. 311(b)(3)(B) requires a “substantial basis for determining the existence of probable cause” as an element of the good faith exception, the alternate holding in Monroe raises two questions:[2] (1) Did Monroe correctly apply the good faith exception? and (2) Does Mil.R.Evid. 311(b)(3) establish a more stringent rule for applying the good faith exception in the military than Leon does for civilian courts?
We answer the first question in the affirmative: Monroe correctly applied the good faith exception as defined in Leon and Sheppard, the two decisions referenced in the Drafters’ Analysis of Mil.R.Evid. 311(b)(3). This Court observed in Monroe that “there is no suggestion on the record that [the official executing the warrant] acted with anything less than objective good faith in seeking and executing the search authorization.” 52 MJ at 332. Our Court then examined the four exceptions to the good faith exception laid out in Leon and concluded that none of them were applicable. There was no suggestion that the affidavit was false or reckless and no indication that the magistrate abandoned his judicial role. Neither the affidavit nor the search authorization was facially deficient. Thus, our Court concluded that the good faith exception was applicable, even if probable cause was lacking.
Turning to the second question, we conclude that Mil.R.Evid. 311(b)(3) does not establish a more stringent rule than Leon did for civilian courts. The first prong (a search warrant or search authorization issued by competent authority) is identical to the civilian rule. The second prong addresses the first and third exceptions noted in Leon, i.e., the affidavit must not be intentionally or recklessly false, and it must be more than a “bare bones” recital of conclusions. It must contain sufficient information to permit the individual executing the warrant or authorization to reasonably believe that there is probable cause. The third prong addresses the second and fourth exceptions in Leon, ie., objective good faith cannot exist when the police know that the magistrate merely “rubber stamped” their request, or when the warrant is facially defective.
Mil.R.Evid. 311(b)(3)(B) uses the phrase “substantial basis” as the second element of good faith. This terminology raises an interpretative issue, because the same phrase is used in Gates to describe the standard by which the magistrate’s determination of probable cause is reviewed.[3] Nevertheless, in light of the congressional mandate in Article 36, UCMJ, 10 USC § 836; the drafters’ stated intent to adopt the good faith exception as set out in Leon and Sheppard; and the absence of evidence that the President intended to promulgate a more stringent rule for the military, we should construe Mil. R.Evid. 311(b)(3) in a manner consistent with those decisions, if possible. To do otherwise would effectively abolish the good faith exception in military practice. Any search that failed the Gates test for reviewing probable cause determinations (“a ‘substantial basis for ... concluding]’ that probable cause existed”) would also fail the test for good faith in Mil.R.Evid. 311(b)(3), because the second prong (“a substantial basis for determining the existence of probable cause”) would not be satisfied. If we were to interpret the “substantial basis” language in Mil.R.Evid. 311(b)(3)(B) as an additional requirement beyond the requirements of Leon, the good-faith exception would not be an exception at all, and the language would serve no purpose. *422 We need not construe the rule in that fashion.
We conclude that the phrase “substantial basis” has different meanings, depending on the issue involved. When the issue is whether the magistrate erred by determining that probable cause existed, Gates established “substantial basis” as the standard for reviewing the magistrate’s probable cause determination. When the issue is whether the good faith exception should be invoked, Mil.R.Evid. 311(b)(3)(B) uses “substantial basis” to describe the absence of the first and third exceptions to good faith outlined in Leon. “Substantial basis” as a standard of review examines the information supporting the request for a search authorization through the eyes of a judge evaluating the magistrate’s decision. In this context, the search authorization will be upheld if the judge determines that the issuing magistrate had a “substantial basis” for determining the existence of probable cause. “Substantial basis” as an element of good faith examines the affidavit and search authorization through the eyes of a reasonable law enforcement official executing the search authorization. In this context, the second prong of Mil.R.Evid. 311(b)(3) is satisfied if the law enforcement official had an objectively reasonable belief that the magistrate had a “substantial basis” for determining the existence of probable cause.
Thus, in Monroe, when this Court assumed arguendo that there was no “substantial basis” for issuing a search authorization, it assumed that the magistrate erred in concluding that there was probable cause. This Court did not assume or conclude that Mil. R.Evid. 311(b)(3)(B) was not met; it concluded to the contrary and held that, even if there was no probable cause, the good faith exception would apply.
Applying the foregoing analysis to this case, we hold that, even if LTC Hunter did not have a “substantial basis” for determining the existence of probable case, the military judge did not abuse his discretion by denying the motion to suppress, because all the elements of the good faith exception were satisfied.
There was no issue regarding LTC Hunter’s authority to issue a search authorization. Appellant concedes that the first prong of Mil.R.Evid. 311(b)(3) was satisfied.
With respect to the second prong, SA Voos supported his request for a search authorization with a detailed and balanced affidavit. It went far beyond a “bare bones” affidavit. He identified the sources of his information, and he identified conflicts and gaps in the evidence. There was no evidence that he intentionally or recklessly omitted or misstated any information. Once LTC Hunter approved the request for a search authorization, SA Meyer, who executed it, was objectively reasonable in believing that SA Voos had given LTC Hunter a “substantial basis” for concluding that there was probable cause. Accordingly, we conclude that the second prong of Mil.R.Evid. 311(b)(3) was satisfied.
Finally, LTC Hunter did not rubber stamp the request. Instead, he carefully reviewed it, asked for additional information, and reduced the scope of the search authorization before approving it. Moreover, the search authorization was not facially deficient. Accordingly, we conclude that the third prong of Mil.R.Evid. 311(b)(3) was satisfied.
For all of the above reasons, we conclude that SA Meyer executed the search authorization in good faith. Accordingly, we hold that the military judge did not err by denying the motion to suppress.

III. Decision

The decision of the United States Army Court of Criminal Appeals is affirmed.

. All Manual provisions are cited to the version applicable at trial. The current version is unchanged unless otherwise indicated.

. We raise these issues sua sponte. They were not specifically argued by appellant.

. The issue raised by the phrase "substantial basis” underscores the risks inherent in codifying evolving constitutional issues. We suggest that the problem might be alleviated if the rules were written in more flexible language with respect to situations where the President did not intend to set forth specific military rules but, instead, intended to follow evolving civilian practice.