*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

————————

## UNITED STATES
Appellee

**v.**

## Calvin E. PERKINS Jr., Sergeant
United States Marine Corps, Appellant

### No. 18-0365
Crim. App. No. 201700077

Argued January 22, 2019—Decided April 23, 2019

Military Judges: J. K. Carberry and M. D. Zimmerman

For Appellant: *Lieutenant Commander William L. Geraty*, JAGC, USN (argued).

For Appellee: *Lieutenant Kurt W. Siegal*, JAGC, USN (argued); *Colonel Mark K. Jamison*, USMC, *Lieutenant Kimberly Rios*, JAGC, USN, and *Brian K. Keller,* Esq. (on brief).

Judge MAGGS delivered the opinion of the Court, in which Chief Judge STUCKY, and Judges RYAN and SPARKS, joined. Judge OHLSON filed a separate dissenting opinion.

————————

Judge MAGGS delivered the opinion of the Court.

A general court-martial with officer and enlisted members found Appellant guilty, contrary to his pleas, of one specification of conspiracy to commit the offense of larceny and one specification of violating a lawful general order in violation of Articles 81 and 92, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 881, 892 (2012).[1] The court-martial sentenced Appellant to be reduced to the lowest en-

---

[1] The court-martial found Appellant not guilty of one specification of conspiracy to commit larceny of military property, two specifications of making false official statements, one specification of larceny of military property of a value of more than $500, two specifications of larceny of military property, two specifications of wrongfully endeavoring to impede an investigation, and one specification of adultery in violation of Articles 81, 107, 121, 134, UCMJ, 10 U.S.C. §§ 881, 907, 921, 934 (2012).

listed grade and to be discharged from the United States Marine Corps with a bad-conduct discharge. The convening authority approved the adjudged findings and sentence and, except for the punitive discharge, ordered the sentence executed. The United States Navy-Marine Corps Court of Criminal Appeals (NMCCA) affirmed. *United States v. Perkins*, 78 M.J. 550, 467 (N-M. Ct. Crim. App. 2018). Acting pursuant to Article 67(a)(2), UCMJ, 10 U.S.C. § 867(a)(2), the Judge Advocate General of the Navy ordered the case to be sent to this Court for review, requesting that we consider the following two issues:

I. Whether this Court's holding in *United States v. Carter*[2] as applied by the Navy-Marine Corps Court of Appeals in this case, instead of the plain reading of MRE 311(c)[3] this Court applied in *United States v. Hoffmann*,[4] controls in analyzing the applicability of the good faith exception to the exclusionary rule.

II. Whether the military judge erred in denying a defense motion to suppress evidence obtained from a search of Appellant's home?

For reasons that we explain below, we conclude that the NMCCA properly followed our decision in *United States v. Carter*, 54 M.J. 414 (C.A.A.F. 2001), when applying M.R.E. 311(c)(3).[5] We also affirm the NMCCA's decision that the military judge did not abuse his discretion in denying a defense motion to suppress evidence obtained from the search of Appellant's home.

---

[2] *United States v. Carter*, 54 M.J. 414 (C.A.A.F. 2001).

[3] Military Rule of Evidence (M.R.E.) 311(c).

[4] *United States v. Hoffmann*, 75 M.J. 120 (C.A.A.F. 2016).

[5] The version of M.R.E. 311 in the *Supplement to Manual for Courts-Martial, United States, Military Rules of Evidence* (2012 ed.), applies to this case. The President made several minor amendments to M.R.E. 311 in the *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*).

## I. Background

### A. The Search Authorization

On October 1, 2015, a civilian, Ms. MI, contacted the Naval Criminal Investigative Service (NCIS) at Marine Corps Air Station (MCAS) Yuma in Yuma, Arizona. MI reported that Appellant was threatening to release photographs and videos that he had taken of her while she was having sexual intercourse with him unless she met various demands. MI informed the NCIS that in response to Appellant's threats, she had already bought Appellant a television and a gun safe, she had paid for a year-long storage unit rental, and she had given Appellant some of her furniture. MI acknowledged that she had never seen Appellant take videos or photographs of her while they had sex. But she recalled that Appellant had used his cell phone at least once while they were engaged in sexual activity. MI also told the NCIS that Appellant had electronic devices in his home capable of storing digital videos and photographs.

On the same day, in response to MI's allegations, Appellant's command drafted a Military Protective Order (MPO).[6] The command then contacted Appellant, who was away on leave, and ordered him to return to base to receive and sign the MPO. The command expected Appellant to arrive at the base that evening or the next morning.

Special Agent Jessica Jurj of the NCIS was concerned that Appellant might destroy evidence upon returning home. She sought legal advice on how to proceed from the local trial counsel (Captain Angel Alfaro), the remotely located senior trial counsel (Major Eric Catto), and the base commander's staff judge advocate (Major Gregory Funk). They advised Special Agent Jurj that she should request the base commander, Colonel Ricardo Martinez, to authorize the NCIS to search Appellant's residence before he returned to the base. Special Agent Jurj then called Colonel Martinez to request a verbal command search and seizure authorization. Her testimony about the call was as follows:

---

[6] Neither a copy of the MPO nor a description of its contents is included in the record.

Q. Can you walk us through that phone conversation with as much detail [as you can] remember?

A. . . . I called Colonel Martinez, after consulting with Captain Alfaro, at the time . . . the trial counsel here at MCAS Yuma, and explaining all the detail to him and Major Funk[,] who's the Staff Judge Advocate for MCAS Yuma at the time. And I explained all the known facts to us, all the reports that [MI] had made to us during her interview, the MPO issuance, the return of Sergeant Perkins to base later that night, and the potential of him destroying electronic evidence, due [to] him knowing that there was an MPO and that there was a potential investigation initiated as a result of that. I explained all those known facts at the time to Colonel Martinez on the phone. I don't recall the exact verbiage I used; however, those were the parameters of what I explained to him.

. . . .

Q. What did Colonel Martinez say in response?

A. Colonel Martinez wanted additional information. He wanted us to explain all the facts in detail, which I went [over] in detail with him as well as Major Funk. I explained to him that I had consulted Captain Funk and Captain Alfaro. I explained the residence, where it was located, the impact it could have on the community on Marine Corps Air Station Yuma. And after explaining everything, Colonel Martinez agreed to issue a verbal command authorized search and seizure under exigent circumstances and requested that we provide updates, very frequently, as to what we had encountered at the residence, upon conducting our search.

Colonel Martinez's recollection of the call was similar. In a sworn statement, Colonel Martinez recalled:

> [Agent Jurj] informed me that a female civilian, Ms. [MI,] reported earlier that day that Sgt Perkins was extorting her by threatening to reveal personal nude videos and photographs if she did not purchase him goods. Agent Jurj informed me that the videos and pictures were likely contained inside of Sgt Perkins' home, and due to an earlier conversation with [the

Appellant's Sergeant Major], she believed Sgt Perkins was returning to the home that very evening. I determined that there was probable cause for a search and granted [a Command Authorization for Search and Seizure] over the phone that evening authorizing NCIS Agents to search Sgt Perkins' home . . . for all electronic devices and media storage containers capable of containing videos, photographs, and other electronic devices.

NCIS agents immediately acted on Colonel Martinez's verbal search authorization. During an initial protective sweep of Appellant's home, NCIS agents entered Appellant's detached garage and saw a light anti-tank weapon tube. They also observed other military gear in the garage. Special Agent Jurj then stopped the search, called Colonel Martinez, and requested and obtained an expanded search authorization to search for stolen military property. That evening and the following day, the NCIS discovered and seized ammunition and other military property from Appellant's garage.

### B. Denial of the Motion to Suppress and Appeal

Prior to trial, Appellant moved to suppress the evidence obtained from the searches and all derivative evidence under M.R.E. 311(a), which generally makes "[e]vidence obtained as a result of an unlawful search or seizure made by a person acting in a governmental capacity . . . inadmissible against the accused." Appellant argued that "the search authorization was unconstitutionally vague, was lacking in probable cause, and failed to meet the particularity requirement of the Fourth Amendment." The military judge concluded that there was probable cause and denied the motion through an oral ruling on the record. The Government used the seized evidence at trial against Appellant, and the court-martial found him guilty of conspiracy to commit the offense of larceny as described above.

On appeal to the NMCCA, Appellant made several arguments for concluding that the military judge had abused his discretion in denying the motion to suppress the seized evidence. Appellant asserted, for the first time, that "Colonel Martinez, the Commanding Officer (CO) of the MCAS Yuma, did not make an independent determination of probable

cause; instead he simply ratified the bare conclusions of [Special Agent] Jurj." Brief for Appellant at 8, *United States v. Perkins*, 78 M.J. 550 (N-M. Ct. Crim. App. 2018) (No. 201700077). Appellant also argued that Colonel Martinez "did not have a substantial basis for concluding that probable cause existed to search [Appellant's] home and seize any electronic devices found therein." *Id.* at 12. Appellant further contended that neither the good faith exception in M.R.E. 311(c)(3) nor the inevitable discovery exception described in *United States v. Hoffmann*, 75 M.J. at 125, applied. Brief for Appellant at 16−17, *Perkins*, 78 M.J. 550.

The NMCCA agreed with Appellant that Colonel Martinez lacked probable cause to issue the search authorization. *Perkins*, 78 M.J. at 557−58. The NMCCA reasoned that Colonel Martinez had insufficient information to assess MI's veracity or to conclude that a search of Appellant's home might uncover evidence. *Id.* The court explained:

> Special Agent [Jurj] could not . . . identify a particular device that was the proper subject of the search or a reason why such a device would be in the appellant's house. MI had made a generalized contention that the appellant had "other devices in his house, electronic devices capable of storing such media," but this tells us almost nothing about what they might be or why incriminating images might be on them. The most concrete nexus between the requested authorization and potential evidence is the possibility that the appellant removed the SD card from his phone and stored it in his house while he (and his cell phone) were out of state. Special Agent [Jurj], however, did not provide the CO with any reason to think that was at all probable.

*Id.* at 558.

Despite determining that Colonel Martinez lacked probable cause to issue the search authorization, the NMCCA concluded that the evidence should not be suppressed because all three elements of the good faith exception in M.R.E. 311(c)(3) were met.[7] *Id.* at 562–63. The first element,

---

[7] M.R.E. 311(c)(3) provides:

as stated in M.R.E. 311(c)(3)(A), is that "the search or sei-
zure resulted from an authorization . . . issued by an indi-
vidual competent to issue the authorization." The NMCCA
concluded that Colonel Martinez was competent to authorize
the search of an on-base residence. 78 M.J. at 561. The se-
cond element, as stated in M.R.E. 311(c)(3)(B), is that "the
individual issuing the authorization or warrant had a sub-
stantial basis for determining the existence of probable
cause." The NMCCA observed that, in *Carter*, this Court re-
jected a literal reading of this element, which would require
that the person issuing the authorization actually have a
substantial basis for determining the existence of probable
cause. 78 M.J. at 560 (citing *Carter*, 54 M.J. at 422). This
Court in *Carter* held instead that M.R.E. 311(c)(3)(B) re-
quires only that "the law enforcement official [have] an ob-
jectively reasonable belief that the [the person issuing the
authorization] had a 'substantial basis' for determining the
existence of probable cause." 54 M.J. at 422. Following this
precedent, the NMCCA concluded that Special Agent Jurj
reasonably believed that Colonel Martinez had a substantial
basis for determining the existence of probable cause. *Per-
kins*, 78 M.J. at 561. The third requirement, under M.R.E.
311(c)(3)(C), is that "the officials seeking and executing the
authorization or warrant reasonably and with good faith re-
lied on the issuance of the authorization or warrant." The

---

(3) *Good Faith Execution of a Warrant or Search
Authorization.* Evidence that was obtained as a
result of an unlawful search or seizure may be used
if:

    (A) the search or seizure resulted from an au-
thorization to search, seize or apprehend issued
by an individual competent to issue the authori-
zation under Mil. R. Evid. 315(d) or from a search
warrant or arrest warrant issued by competent
civilian authority;

    (B) the individual issuing the authorization or
warrant had a substantial basis for determining
the existence of probable cause; and

    (C) the officials seeking and executing the au-
thorization or warrant reasonably and with good
faith relied on the issuance of the authorization
or warrant. Good faith is to be determined using
an objective standard.

7

NMCCA concluded that Special Agent Jurj and other NMCCA agents involved in the search reasonably and with good faith relied on the issuance of the authorization. 78 M.J. at 561. The NMCCA decided that Special Agent Jurj's actions were reasonable because she articulated a basis for the search that the appropriate lawyers had approved and she did not disregard Appellant's Fourth Amendment rights. *Id.* The NMCCA did not address Appellant's contention that Colonel Martinez had failed to act in a neutral and detached manner and also did not address the inevitable discovery exception.

Although the NMCCA relied on *Carter* in applying the second element of the good faith exception in M.R.E. 311(c)(3)(C), the NMCCA recognized a discrepancy between *Carter* and our subsequent decision in *Hoffmann*. *Perkins*, 78 M.J. at 558–60. In *Hoffmann*, this Court held that M.R.E. 311(c)(3)(B) was not satisfied simply because "the individual issuing the authorization did not have a substantial basis for determining the existence of probable cause." 75 M.J. at 128. The Court did not cite *Carter* or consider the possibility M.R.E. 311(c)(3)(B) could be satisfied *if the officials executing a search authorization believed* that the person issuing the authorization had a substantial basis for determining the existence of probable cause. *Id.* The apparent conflict between *Carter* and *Hoffmann* led the Judge Advocate General of the Navy to order review of this case.

## II. Discussion

Under M.R.E. 311(a), the seized evidence should have been excluded if there was no probable cause for the search authorization unless an exception applies. Although the Government continues to argue that Colonel Martinez had probable cause, the Government agrees that, if we decide that the good faith exception in M.R.E. 311(c)(3) applies, then we do not have to revisit the NMCCA's determination that there was no probable cause for the search authorization.[8] We will therefore take this approach. We will

---

[8] Although the Government did not address the good faith exception in responding to Appellant's motion before the military judge, the Government was permitted to raise the good faith exception in responding to Appellant's appeals to the NMCCA and to

assume for this appeal that there was no probable cause and will focus on the good faith exception. *See United States v. Lopez*, 35 M.J. 35, 39 (C.M.A. 1992) (explaining that a court need not determine if there was sufficient probable cause if it concludes that the good faith exception to the exclusionary rule applies).

In their arguments about the good faith exception in M.R.E. 311(c)(3), the parties do not dispute the NMCCA's conclusion that the first requirement, found in M.R.E. 311(c)(3)(A), was met because Colonel Martinez was competent to issue a search authorization of Appellant's on-base residence.[9] They disagree, however, about whether the second and third requirements of the good faith exception in M.R.E. 311(c)(3)(B) and (C) were satisfied. Appellant also argues that the good faith exception cannot make the evidence admissible because Colonel Martinez did not act in a neutral and detached manner. We address each of these points in turn.

---

this Court. A familiar principle of appellate practice is that "[a]n appellee or respondent may defend the judgment below on a ground not earlier aired." *Greenlaw v. United States*, 554 U.S. 237, 250 n.5 (2008); *see Schweiker v. Hogan*, 457 U.S. 569, 584−85 & n.24 (1982) ("Although appellees did not advance this argument in the District Court, they are not precluded from asserting it as a basis on which to affirm that court's judgment" because of the "well accepted" rule that "an appellee may rely upon any matter appearing in the record in support of the judgment below."). In addition, because the military judge did not rule on whether the government agents in this case acted in good faith, our law of the case doctrine does not preclude appellate consideration of the Government's argument. *United States v. Mack*, 65 M.J. 108, 112 (C.A.A.F. 2007) (law of the case doctrine did not apply to an issue upon which the military judge did not rule).

[9] M.R.E. 311(c)(3)(A) requires a search authorization to be issued by "an individual competent to issue the authorization under Mil. R. Evid. 315(d)." M.R.E. 315(d) and (d)(1) make a commander competent to issue a search authorization provided that the commander is "an impartial individual" and "has control over the place where the property or person to be searched is situated or found." In his brief, Appellant does not address M.R.E. 311(c)(3)(A) and does not contest that Colonel Martinez was competent under M.R.E. 315(d).

A. M.R.E. 311(c)(3)(B)

Under M.R.E. 311(c)(3)(B), as noted above, the second requirement for the good faith exception is that "the individual issuing the authorization or warrant had a substantial basis for determining the existence of probable cause." In *Carter,* we recognized a difficulty in construing the language of this provision.[10] 54 M.J. at 421−22. The trouble is that under United States Supreme Court precedent, when a defendant seeks to exclude evidence on grounds that probable cause does not exist, "the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . [concluding]' that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (alterations in original) (citation omitted). This test for reviewing whether there was probable cause is nearly identical in language to the test stated in M.R.E. 311(c)(3)(B) for the second requirement of the good faith exception. Accordingly, if M.R.E. 311(c)(3)(B) were read literally, in any situation in which a court concluded that probable cause did not exist, the court would also have to conclude that the requirement of M.R.E. 311(c)(3)(B) was not met. Under such an interpretation, as we explained in *Carter*, "the good-faith exception would not be an exception at all, and the language would serve no purpose." 54 M.J. at 421.

In *Carter*, to prevent M.R.E. 311(c)(3)(B) from becoming a nullity, we looked to the purpose of the provision. *Id.* at 421−22. We decided that the President in promulgating the provision was seeking to codify the good faith exception as stated in *United States v. Leon*, 468 U.S. 897 (1984), and *Massachusetts v. Sheppard* 468 U.S. 981 (1984). 54 M.J. at 420. Those cases indicated that the evidence could be admitted if the magistrate authorizing the search had a substantial basis, in "the eyes of a reasonable law enforcement official executing the search authorization," for concluding that probable cause existed. *Id.* at 422. Accordingly, we held that M.R.E. 311(c)(3)(B) is satisfied "if the law enforcement offi-

---

[10] Under the version of the Military Rules of Evidence in force at the time of the trial in *Carter*, the good faith exception was codified in M.R.E. 311(b)(3), *MCM* (1995 ed.). The same language now appears in M.R.E. 311(c)(3).

cial had an objectively reasonable belief that the magistrate had a 'substantial basis' for determining the existence of probable cause." *Id.*

In this case, we agree with the NMCCA that M.R.E. 311(c)(3)(B) is satisfied under the test in *Carter*.[11] The NMCCA properly identified factors indicating that Special Agent Jurj had an objectively reasonable belief that Colonel Martinez had a substantial basis for determining the existence of probable cause. Most significantly, Special Agent Jurj received and apparently relied on the advice of appropriate government lawyers: the local trial counsel, the regional trial counsel, and the staff judge advocate. When Colonel Martinez issued the authorization, Special Agent Jurj could reasonably have concluded that Colonel Martinez was confirming what these three lawyers had already told her.

Appellant, however, requests this Court "reexamine *Carter* and require the application of the plain language of [M.R.E. 311(c)(3)(B)]." Appellant asserts that in *Hoffmann*, this Court quoted and applied M.R.E. 311(c)(3)(B) literally. 75 M.J. at 128. Appellant contends that if the Court were to follow the same approach in this case, the good faith exception could not apply because Colonel Martinez did not have a substantial basis for determining that there was probable cause to authorize the search.

Appellant's argument requires us to review our decision in *Hoffmann*. In that case, the accused's commander issued an authorization to search the accused's computer and other electronic media for child pornography. *Id.* at 123. Although there was information that the accused had attempted to entice children on the street to commit sex acts, there was

---

[11] Because the military judge determined that there was probable cause for the search, the military judge did not make findings of fact or conclusions of law regarding to M.R.E. 311(c)(3)(B). These matters of findings and conclusions therefore fell to the NMCCA. Appellant does not challenge the facts as determined by the NMCCA. We review the NMCCA's conclusions of law de novo. *See United States v. Catrett*, 55 M.J. 400, 404 (C.A.A.F. 2001) (explaining the standard of review when a Court of Criminal Appeals is the finder of fact relevant to an exception to an exclusionary rule).

no information that linked the accused's acts to his possession of child pornography. *Id.* at 127. Accordingly, we determined that the commander did not have probable cause to issue the search authorization. *Id.* We then cursorily decided that the good faith exception did not prevent suppression of the seized evidence, saying:

> The military good-faith exception need not long detain us in this case. As noted above . . . , the individual issuing the authorization did not have a substantial basis for determining the existence of probable cause, a requirement for application of the good-faith exception.

*Id.* at 128. The opinion did not address the possibility, recognized in *Carter*, that the good faith exception could be satisfied if the agents executing the search had an objectively reasonable belief that the magistrate had a substantial basis for determining the existence of probable cause, even if the magistrate did not have such a basis.

Overruling precedent by implication is disfavored. *See United States v. Davis*, 76 M.J. 224, 228 n.2 (C.A.A.F. 2017). We accordingly reject the suggestion that this Court implicitly overruled *Carter* in *Hoffmann* and adopted a literal interpretation of M.R.E. 311(c)(3)(B). The most sensible understanding of *Hoffmann* is that the Court simply did not consider the reasonable beliefs of the agents executing the search. In their briefs in *Hoffmann*, the parties neither cited *Carter* nor addressed the law enforcement agents' beliefs. The Court's opinion in *Hoffmann* likewise did not cite *Carter* or consider Carter's interpretation of M.R.E. 311(c)(3)(B). The *Hoffmann* opinion also did not recognize or address the interpretive problem, explained above, that reading M.R.E. 311(c)(3)(B) literally would render the provision a nullity and eliminate the good faith exception as a practical matter.

To be sure, when precedents conflict, we typically follow the more recent decision. *See United States v. Hardy*, 77 M.J. 438, 441 n.5 (C.A.A.F. 2018). But in this case, we see strong reasons to adhere to *Carter*. *Carter* contains a thorough consideration of a complicated issue, giving effect to all parts of M.R.E. 311. *Hoffmann* does not. In addition, *Carter* is a longstanding precedent, while *Hoffmann* is not. We have recognized that "[w]e will not overturn 'precedent . . . [that]

has been treated as authoritative for a long time . . . unless the most cogent reasons and inescapable logic require it.'" *United States v. Andrews*, 77 M.J. 393, 399 (C.A.A.F. 2018) (alterations in original) (citation omitted). Accordingly, we disapprove the decision in *Hoffmann* to the extent that it differs from *Carter*.

## B. M.R.E. 311(c)(3)(C)

The third requirement of the good faith exception, found in M.R.E. 311(c)(3)(C), is that "the officials seeking and executing the authorization or warrant reasonably and with good faith relied on the issuance of the authorization or warrant." M.R.E. 311(c)(3)(C) further provides that "[g]ood faith is to be determined using an objective standard." We agree with the NMCCA that this element was satisfied.[12]

Appellant argues that Special Agent Jurj did not act in good faith because she was unreasonably mistaken about the law. He points to Special Agent Jurj's testimony, in which she explained: "Due to Sergeant Perkins returning from leave and regaining access to his residence, we requested a command authorized search and seizure under exigent circum[stances] because of the possibility of him destroying evidence." We believe that Special Agent Jurj's reference to urgency was more likely made to justify the lack of a written authorization than to suggest application of a diminished probable cause standard. *But see* M.R.E. 315(a)(1) (exigent circumstances are not necessary for granting an oral, as opposed to written, authorization). However, Appellant is correct that, to the extent, if any, Special Agent Jurj relied on the urgent need to conduct the search to establish probable cause, her rationale was defective. Regardless, a flaw in legal reasoning is not a determinative factor in deciding whether a law enforcement agent acted in good faith.

Instead, we held in *Carter*, law enforcement agents do not act in good faith if they "know that the magistrate merely 'rubber stamped' their request, or when the warrant is facially defective." 54 M.J. at 421. In this case, even if Colonel

---

[12] As with the previous issue, Appellant does not challenge the facts determined by the NMCCA, and we have reviewed the NMCCA's conclusion of law de novo.

Martinez had "rubber-stamped" the application for the search authorization—a contention that we address below—there is no evidence to support a finding of fact that Special Agent Jurj "knew" this. On the contrary, her testimony shows the opposite. After Special Agent Jurj made her presentation to Colonel Martinez, he did not immediately authorize the search. Instead, Special Agent Jurj testified, "Colonel Martinez wanted additional information. He wanted us to explain all the facts in detail, which I went [over] in detail with him as well as Major Funk." Colonel Martinez's request for "all the facts in detail" before making a decision would have indicated to Special Agent Jurj that Colonel Martinez was not rubber-stamping the application. Furthermore, the search authorization was not facially defective because it identified the place to search (Appellant's home) and described in detail what to look for ("all electronic devices and media storage containers capable of containing videos, photographs, and other electronic evidence"). Although Special Agent Jurj may have misunderstood the law regarding what constitutes probable cause, she made the mistake by relying on the opinion of multiple attorneys. We also note that upon entering Appellant's garage and viewing military gear in the garage—evidence not explicitly covered by the initial search authorization—Special Agent Jurj halted the search and immediately requested an expanded search authorization from Colonel Martinez. We therefore conclude that all the requirements of the good faith exception in M.R.E. 311(c)(3) were satisfied.

## C. Lack of Judicial Review

Citing *Leon*, rather than the specific language of M.R.E. 311, Appellant also argues that the evidence must be suppressed because Colonel Martinez " 'wholly abandoned his judicial role' " and "simply rubber-stamped Special Agent [Jurj's] bald assertion that probable cause existed." The Supreme Court in *Leon* held that it will deny deference to a magistrate's determination of probable cause if the magistrate acted as a rubber stamp for the police, and further held that the good faith exception does "not apply in cases where the issuing magistrate wholly abandoned his judicial role" because "in such circumstances, no reasonably well trained officer should rely on the warrant." 468 U.S. at

914, 923. We have followed this principle in several cases. *See United States v. Leedy*, 65 M.J. 208, 217 (C.A.A.F. 2007); *see also United States v. Cravens*, 56 M.J. 370, 373, 376 (C.A.A.F. 2002).

In this case, however, we decline to consider Appellant's argument because Appellant has waived this argument. Under M.R.E. 311(d)(2)(A), arguments for suppression of evidence under M.R.E. 311 that are not made at trial are waived. Applying this rule in *United States v. Stringer*, 37 M.J. 120, 125 (C.M.A. 1993), and *United States v. Robinson*, 77 M.J. 303, 307 & n.6 (C.A.A.F. 2018) (internal quotation marks omitted) (citation omitted), we clarified that the accused must make a "particularized objection" to the admission of evidence, otherwise the issue is waived and may not be raised on appeal. As Judge Wiss explained in a separate opinion in *Stringer*, a particularized objection is necessary so that the government has the opportunity to present relevant evidence that might be reviewed on appeal. 37 M.J. at 132 (Wiss, J., concurring in the result). Here, Appellant did not raise his rubber-stamping argument at trial when he argued that there was no probable cause for the search authorization. Instead, as explained above, Appellant argued only that "the search authorization was unconstitutionally vague, was lacking in probable cause, and failed to meet the particularity requirement of the Fourth Amendment." Appellant argued that Colonel Martinez had failed to act in a neutral and detached manner for the first time on appeal to NMCCA. Like the NMCCA, we will not address this argument on the merits.[13]

---

[13] The dissent asserts that Appellant did not waive the "rubber-stamping" argument in this case because he "was not required to invoke an 'exception to this exception' at trial" given that "the good faith exception was not raised by the Government or the military judge at the trial court level." *United States v. Perkins,* __ M.J. __, __ (2) (Ohlson, J, dissenting). This assertion assumes that rubber-stamping is merely an exception to the good faith exception. This assumption is incorrect. A fundamental principle of the Fourth Amendment is that "[a] magistrate failing to 'manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application' and who acts instead as 'an adjunct law enforcement officer' cannot provide valid authorization for an otherwise unconstitutional search." *Leon,* 468

### III. Judgment

The judgment of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

---

U.S. at 914 (quoting *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326–27 (1979)). Accordingly, the accused can argue in the first instance that a search authorization was invalid because the commander rubber-stamped the government's application; the accused need not first show that the search authorization was invalid for some other reason and then wait for the government to argue that its agents acted in good faith before raising a rubber-stamping objection. *See, e.g., United States v. Clayton*, 68 M.J. 419, 425−26 (C.A.A.F. 2010) (upholding the military judge's determination that a warrant was valid because, among other reasons, the magistrate did not abandon his judicial role and act as a rubber stamp for the government).

Judge OHLSON, dissenting.

The facts known by the commanding officer at the time he approved the search authorization in this case were so lacking in any indicia of probable cause that this Court is compelled under the dictates of the Supreme Court's decision in *United States v. Leon*, 468 U.S. 897 (1984), to hold in favor of Appellant. Specifically, this Court should conclude that the commanding officer served simply as a "rubber stamp" in the search authorization process because his actions constituted a mere ratification of the facially deficient, bare bone assertions that were presented to him. *Id.* at 914 (internal quotation marks omitted) (citation omitted). We should hold, therefore, that the military judge in the instant case abused his discretion in denying the defense motion to suppress evidence seized from Appellant's home. Because the majority has ruled to the contrary, I respectfully dissent.[1]

## Assertion of Waiver

The majority concludes that Appellant waived the argument that the commanding officer improperly "rubber-stamped" the search authorization. Specifically, the majority takes the position that because an accused *may* object at trial to the "rubber-stamping" of a search authorization request, then an accused *must* object at trial to this impermissible conduct or this argument will be deemed waived on appeal. Under the specific facts of this case, I am unpersuaded by this reasoning.

---

[1] I note at the outset of this separate opinion that I reluctantly concur with the majority's resolution of Issue I regarding the question of "[w]hether this Court's holding in *United States v. Carter* [or] in *United States v. Hoffmann* controls in analyzing the applicability of the good faith exception to the exclusionary rule." The principal of stare decisis, as recently articulated in *United States v. Andrews*, 77 M.J. 393 (C.A.A.F. 2018), prevails in this matter, and consistent with our holding in *United States v. Carter*, 54 M.J. 414 (C.A.A.F. 2001), we must act as if the plain language of Military Rule of Evidence (M.R.E.) 311(c)(3)(B) does not really say what it in fact clearly says. Therefore, the majority's harmonization of *Hoffmann* with *Carter* is appropriate.

As is evident from the record, during motions practice at the court-martial the Government argued that there was probable cause to search Appellant's home. Appellant argued that there was no probable cause. The military judge then ruled in the Government's favor by holding that there was indeed probable cause. Thus, neither the Government nor the military judge raised the argument that (a) there was no probable cause to search Appellant's home but (b) the good faith exception applied, thereby rendering the fruits of that search admissible at trial. Rather, this line of reasoning arose for the first time at the United States Navy-Marine Corps Court of Criminal Appeals (CCA).

In my view, because the good faith exception was not raised by the Government or the military judge at the trial court level, Appellant was not required to invoke an "exception to this exception" at trial in order to preserve the issue on appeal. Under the majority's approach, trial defense counsel now need to be not only learned, alert, and reactive, they also must be clairvoyant. That is, during trial they must be able to foresee—and then object to—legal issues that are neither raised nor ripe until the case wends its way to a court of criminal appeals. I do not subscribe to such an approach.[2]

---

[2] The majority's disparate treatment of the prosecution and the defense is noteworthy. As is permissible, for the first time on appeal to the CCA the Government argued that the good faith exception applies to this case. Brief for Appellee at 10, *United States v. Perkins*, 78 M.J. 550 (N-M. Ct. Crim. App. 2018) (No. 201700077). The majority now endorses and adopts this approach. Similarly, for the first time on appeal to the CCA, Appellant argued that the good faith exception does *not* apply to this case because the commanding officer rubber-stamped the search authorization request. Brief for Appellant at 16, *Perkins*, 78 M.J. 550 (N-M. Ct. Crim. App. 2018) (No. 201700077). Not only does the majority reject this argument, however, it actually prevents Appellant from even making this argument, asserting that it was waived because Appellant did not raise it at trial. Thus, even though the Government can raise the good faith exception for the first time on appeal, under the majority's approach Appellant is foreclosed from raising for the first time on appeal one of the four explicit limita-

**Overview of the Good Faith Exception**

Turning to the issue at the heart of this case, in *Leon*, the Supreme Court held that there was a good faith exception to the exclusionary rule under the Fourth Amendment of the Constitution. 468 U.S. at 905, 912. Specifically, the Court held that the use of evidence obtained by law enforcement officers acting in reasonable reliance on a search warrant issued by a neutral and detached magistrate should not be barred at trial simply because that warrant was ultimately found to be invalid. *Id.* at 918. The President then promulgated this good faith exception in the M.R.E. *See* M.R.E. 311(c)(3).

Importantly, however, in *Leon* the Supreme Court specifically noted that in the course of applying the good faith exception to particular cases, the great deference that should be given to a magistrate's probable cause determination "*is not boundless.*" *Leon*, 468 U.S. at 914 (emphasis added). In fact, the Supreme Court spelled out certain scenarios where the good faith exception is not applicable despite the issuance of a warrant. One such instance that is relevant to the instant case is when the official authorizing the search fails to act in a neutral and detached manner and instead "serve[s] merely as a rubber stamp" for law enforcement officers. *Id.* (internal quotation marks omitted) (quoting *Aguilar v. Texas*, 378 U.S. 108, 111 (1964)). This principle was underscored by this Court in *Carter* where we held that the good faith exception does not apply "[w]here the magistrate 'wholly abandoned his judicial role' *or* was a mere rubber stamp for the police." 54 M.J. at 419 (emphasis added) (quoting *Leon*, 468 U.S. at 923). The good faith exception does not apply in this circumstance because "no reasonably well trained officer should rely on the warrant." *Leon*, 468 U.S. 923.

An analysis of relevant case law demonstrates that there are two dimensions to the issue of whether a magistrate merely "rubber-stamped" a search warrant; one is procedural and one is substantive. Procedural rubber-

tions to the good faith exception that the Supreme Court specifically listed in *Leon*. In my mind, this is a curious result.

stamping occurs, for example, when: (a) the magistrate fails to engage in the necessary process of reviewing the supporting affidavit, *see* 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 1.3(f), at 96 (5th ed. 2012) ("the magistrate gave the affidavit such a quick scan that meaningful judicial review of the allegations therein simply could not have occurred"); or (b) "the magistrate functionally occupied a different, non-neutral role while making the probable cause determination." *United States v. Barnes,* 895 F.3d 1194, 1202 (9th Cir. 2018). As an example of the latter, in *Lo-Ji Sales, Inc. v. New York*, the magistrate accompanied police and prosecutors when they executed the search warrant he had just authorized, thereby becoming an "adjunct law enforcement officer." 442 U.S. 319, 327 (1979).

Substantive rubber-stamping, on the other hand, arises when it can be said that the magistrate necessarily must have acted as a rubber stamp for law enforcement because it was facially and objectively clear from the paucity or the quality of the information contained in the affidavit that there was no probable cause. This point was perhaps best articulated by the United States Court of Appeals for the Fourth Circuit when it held as follows: "We find that the good faith exception to the exclusionary rule should not apply in this case due to the 'bare bones' nature of the affidavit, and because the state magistrate could not have acted as other than a 'rubber stamp' in approving such an affidavit." *United States v. Wilhelm*, 80 F.3d 116, 121 (4th Cir. 1996).

#### Facts

In determining whether substantive rubber-stamping improperly occurred in the instant case, we need merely review the salient facts provided by the CCA in its laudably insightful and comprehensive majority opinion. The points cited below, which are adopted verbatim from the CCA opinion except as otherwise noted, are accompanied by parenthetical commentaries as warranted. *See United States v. Perkins*, 78 M.J. 550, 554–58 (N-M. Ct. Crim. App. 2018).

- "[There is only] a limited factual record. As this was a

telephonic request for a search authorization, Special Agent JJ did not create an affidavit in support of her request to the CO."[3] *Id.* at 556.

- "[T]he record does not include any evidence addressing MI's[4] veracity or provide any reason for the CO to have found MI's account credible." *Id.* at 557.

- "MI's account to Special Agent JJ was, so far as we can tell, unsupported by any corroborating evidence." *Id.*

- "MI denied ever seeing any [illicit] pictures or video [of herself] and did not specifically claim to have seen the appellant take any." *Id.* at 554.

- "[At the time that Special Agent JJ sought the search authorization of Appellant's home, t]here was no reason to believe the appellant's cell phone was anywhere except with the appellant, who was out of the state." *Id.* at 557.

- "There is no evidence that MI claimed that these alleged images were created in the appellant's home or with a device likely to be found in the appellant's home." *Id.*

- "No one identified any particular device in the appellant's home that would have been a likely place for the appellant to have stored any such videos or images." *Id.*

- "MI did not say where she thought the recordings might have happened, nor did she suggest that the appellant kept any cameras in his home that could have been used to make these recordings." *Id.* at 554.

- "Since the appellant's squadron had directed the ap-

---

[3] "CO" refers to "commanding officer."

[4] MI was the complainant in this case.

pellant [who was on leave] to come back to [the base] that night, Special Agent JJ decided to ask the base CO for 'a command authorized search and seizure under exigent circum[stances] because of the possibility of [Appellant] destroying evidence.'" *Id.*

(This was a pretty nifty trick on the Government's part. The Government *created* the purported exigency by calling Appellant back from leave, then the Government *cited* Appellant's imminent arrival as an exigent circumstance for seeking a search authorization on an expedited basis. Moreover, it must be noted that exigency is an *exception* to the warrant requirement—it is not a basis for a finding of probable cause to search. *Missouri v. McNeely*, 569 U.S. 141, 148–49 (2013). And finally, any exigent circumstances actually present in the instant case did not make it any more likely that the evidence—if it existed—could be found in Appellant's home.)

- "[Special Agent JJ] called the base CO. She told him 'all [the] known facts at the time[.]' When the CO responded by asking Special Agent JJ to 'explain all the facts in detail,' she told him that she had consulted the staff judge advocate and the trial counsel, and 'explained the residence, where it was located, the impact it could have on the community on Marine Corps Air Station Yuma.'" 78 M.J. at 554–55 (alterations in original).

(Precisely nothing in this response by Special Agent JJ to the commanding officer's inquiry increased the indicia of probable cause in this case. But this response apparently did have the desired effect of steamrolling the commanding officer into granting the search authorization by blatantly appealing to his role as a commander rather than to his responsibilities as a neutral and detached official who needed to decide whether there was probable cause to conduct a search of Appellant's home. In explaining why it was appropriate to limit the scope of the exclusionary rule through the invocation of the good faith exception, the Supreme Court in *Leon* specifically cited the fact that

neutral and detached officials "have no stake in the outcome of particular criminal prosecutions." 468 U.S. at 917. But in the instant case, that patently was not so. Special Agent JJ emphasized that the safety and security of the commanding officer's Marines and their family members were dependent upon the commanding officer's approval of the search authorization. This type of scenario presumably was on the minds of the drafters of M.R.E. 313 when they wrote: "[C]ommanders cannot be equated constitutionally to magistrates. As a result, commanders' authorizations *may be closely scrutinized for evidence of neutrality* in deciding *whether* [the good faith exception] will apply." *Manual for Courts-Martial, United States*, Analysis of the Military Rules of Evidence app. 22 at A22-20 (2016 ed.) (emphasis added).)

- "Special Agent JJ testified [at the suppression hearing] that, based on this information, the CO 'agreed to issue a verbal command authorized search and seizure under exigent circumstances . . . .' The authorization covered the entire residence." 78 M.J. at 555 (alterations in original).

- "Because Special Agent JJ thought that the evidence she sought could have been stored on a cell phone's memory, or 'SD' card, and that the SD card might have been removed from the cell phone, she understood the authorization to extend to 'anything that was small enough to contain . . . a very, very small media storage device . . . it can be something as small as a nail.'" *Id.* (alterations in original).

(The problems with Special Agent JJ's approach and reasoning are manifold. First, there was no evidence that Appellant's specific cell phone had an SD card. Second, there was no evidence that even if his cell phone did have an SD card that Appellant transferred any illicit images of MI to that SD card. Third, even if there were illicit images on an SD card, there was no evidence that Appellant had removed that SD card and stored it someplace other than in his cell phone.

*United States v. Nieto*, 76 M.J. 101, 107 (C.A.A.F. 2017) ("[The] cell phone, by itself, had the ability to serve both as the instrumentality of the crime and as a storage device for the fruit of that crime."). And fourth, even if all of Special Agent JJ's imaginings were true, there was no evidence that the storage place was Appellant's home.)

- "According to Special Agent JJ, MI said that the appellant '*possibly* was storing electronic media containing all these videos and footage of them having sex,' and [MI] 'did [*al*]*lude to the potential* of him using other devices . . . in his house, electronic devices capable of storing such media.'" 78 M.J. at 554 (alterations in original).

  (The wording of this testimony by Special Agent JJ stands in stark contrast to the universally accepted principle that probable cause must be based on a "fair probability" and not on a "mere possibility." *United States v. Rogers*, 67 M.J. 162, 165 (C.A.A.F. 2009) (probable cause exists when a "common sense judgment would lead to the conclusion that there is a fair probability that evidence of a crime will be found at the identified location").)

- "Special Agent JJ could not even identify a particular device that was the proper subject of the search or a reason why such a device would be in the appellant's house." 78 M.J. at 558.

  (It is evident from the last series of facts that the search authorization in this case runs directly afoul of our holding in *Nieto* where we held that there must be a demonstrated "particularized nexus" between the thing to be seized and the place to be searched. 76 M.J. at 103. Here the only thing linking the hypothetical illicit images of MI to Appellant's home was conjecture stacked upon innuendo founded on speculation.)

- "At the hearing on the motion, the government also provided an affidavit signed by the base CO explain-

ing his probable cause determination. The relevant portion of the affidavit is short:

> [JJ] informed me that a female civilian, [MI], reported earlier that day that Sgt Perkins was extorting her by threatening to reveal personal nude videos and photographs if she did not purchase him goods. Agent [JJ] informed me that the videos and pictures were likely contained inside of Sgt Perkins' home, and due to an earlier conversation with [the appellant's sergeant major], she believed Sgt Perkins was returning to the home that very evening. I determined that there was probable cause for a search."

78 M.J. at 555 (alterations in the original).

(The commanding officer's affidavit, prepared for the purpose of supporting his probable cause determination at the motion hearing, is remarkably conclusory and devoid of any analytical reasoning. Instead, it contains nothing more than a mere recital of the allegation against Appellant and the fact that Special Agent JJ told him that she thought it likely that NCIS would find the alleged nude images of MI in Appellant's home. And yet, this grossly deficient affidavit was apparently the best the Government could do in explaining and supporting the commanding officer's decision to grant the search authorization in this case.)

- "The government presented no other evidence supporting the CO's probable cause determination." *Id.*

- "The search of the appellant's home did not reveal any nude photos or videos of MI. It did, however, result in NCIS's discovery of government property in the appellant's garage." *Id.*

**Analysis**

As noted above, consistent with this Court's decision in *Carter*, 54 M.J. at 419, where we said that the good faith exception does not apply where the commanding officer "was a mere rubber stamp for the police," this Court should hold that commanding officers can be said to have necessarily acted as a rubber stamp in those cases where, based on the paucity or quality of the facts presented to them, it was facially, clearly, and objectively unreasonable for the commander to conclude that there was probable cause to authorize the search of a servicemember's home.[5]

In the instant case, the facts presented in support of the search authorization were bare bones; those facts were predicated on uncorroborated assertions of a single individual of unknown credibility; the facts failed to articulate any particularized nexus linking the item to be seized with the place to be searched; the Government improperly invoked exigent circumstances as a basis for the search authorization; the commander abdicated his role as a neutral and detached official upon the Government's appeal to his duties and responsibilities as a commanding officer; there is nothing in the record indicating the degree to which the commanding officer actually substantively analyzed the facially deficient information presented to him at the time of the search authorization request; and at a hearing on a suppression motion, the commanding officer was notably unable to articulate in an affidavit how the facts of the case caused him to conclude that probable cause existed at the time he granted the search authorization. Therefore, it was facially, clearly, and objectively unreasonable for the

---

[5] The right to privacy in one's home is a most important interest protected by the Fourth Amendment and a continuing theme in constitutional jurisprudence. *See, e.g., Payton v. New York*, 445 U.S. 573, 585 (1980) (" 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed' " (quoting *United States v. United States Dist. Court*, 407 U.S. 297, 313 (1972))).

*Wilhelm*, 80 F.3d at 120–21.

commander to authorize the search. Under these circumstances, no reasonable law enforcement officer would rely on the commander's search authorization. *See Leon*, 468 U.S. at 923. Further, because the military judge's denial of the motion to suppress was influenced by an erroneous view of the law, he abused his discretion by failing to suppress the evidence seized from Appellant's home. Accordingly, Appellant's conviction for conspiracy to commit larceny should be reversed.

## Conclusion

Today's majority opinion has wide-ranging and serious implications. In the instant case the commander's probable cause determination was facially, clearly, and objectively unreasonable, and yet the majority has voted to affirm Appellant's conviction, seemingly heedless of the Supreme Court's admonition that the deference that is to be afforded an official's probable cause determination "is not boundless." *Leon*, 468 U.S. at 914. As a result, judges at the service courts of criminal appeals will undoubtedly conclude that a commander's probable cause determination—no matter how meritless—is, for all intents and purposes, immune from appellate review. And, it must be emphasized, this result is a direct consequence of the *Carter* decision which we are regrettably compelled to adhere to pursuant to the doctrine of stare decisis, but which inarguably ignored the plain language written by the President in M.R.E. 311(c)(3). This is a shaky foundation indeed upon which to authorize a law enforcement officer to conduct an invasive search of a servicemember's home.

In the military's search authorization process, this Court must not permit the good faith exception to the exclusionary rule to so subvert the essential role that a commanding officer is required to play in providing the "detached scrutiny of a neutral magistrate," *Leon* 468 U.S. at 913 (internal quotation marks omitted) (quoting *United States v. Chadwick*, 433 U.S. 1, 9 (1977)), that we will place our imprimatur on those instances where a commanding officer merely rubber- stamps the request of a law enforcement officer to search every crevice of a servicemember's home. To do so, as the majority has done in the instant case, renders

illusory the protections afforded our servicemembers under the Fourth Amendment to the Constitution.

This Court should set aside the findings and sentence for Specification 1 of Additional Charge III.